UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 0:22-cv-61997-DSL/VALLE

GREAT AMERICAN INSURANCE
COMPANY,

      Plaintiff,

v.

ORACLE ELEVATOR HOLDCO, INC.
F/K/A OEC HOLDING CORPORATION
and EVEREST NATIONAL INSURANCE
COMPANY,

      Defendants.
_____/

**EVEREST NATIONAL INSURANCE COMPANY'S
MOTION FOR SUMMARY JUDGMENT ON COUNT I OF GREAT AMERICAN
INSURANCE COMPANY'S FIRST AMENDED COMPLAINT**

Everest National Insurance Company ("Everest"), pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, hereby files this Motion for Summary Judgment on Count I of Great American Insurance Company's ("Great American") First Amended Complaint [D.E. 60], and states that there is no genuine dispute as to any material fact and judgment should be entered against Great American as a matter of law. Everest's Statement of Material Facts for this motion [D.E. 167] has been filed contemporaneously herewith.[1]

**SUMMARY OF ARGUMENT**

Great American received timely notice of the Mendez Lawsuit. Oracle was required to notify its excess insurer, Great American, only when a claim was reasonably likely to exceed

---

[1] Unless otherwise indicated herein, this motion uses the same defined terms and abbreviations as Everest's Statement of Material Facts.

Everest's $1 million primary coverage or could reasonably involve the excess policy. Oracle's defense counsel (and Everest) consistently assessed the Mendez Lawsuit below this threshold, citing viable liability defenses and minimal evidence of damages.  However, in October and November of 2021, there were revelations of perjury from a key defense witness, new evidence of potential income loss, and additional medical information suggesting possible surgeries. Great American was promptly notified after these developments occurred, and it had the opportunity to thoroughly assess the case for six months prior to trial.  Great American had all of the information necessary to evaluate the Mendez Lawsuit well before trial, yet it consistently valued the claim below its excess layer at all times prior to the verdict. For Great American to now argue that notice should have been provided sooner is illogical and self-serving.

Since notice to Great American was timely, judgment should be entered against it on that basis alone, without needing to address whether Great American was prejudiced by the timing of notice.  Even so, Great American cannot meet its burden of establishing prejudice. Notice was provided six months before trial, allowing Great American to obtain all necessary information, participate in decision-making, and influence settlement strategy. Indeed, Great American was actively involved in Oracle's defense from the time it received notice.  It regularly communicated with Oracle's defense counsel, received updates on key case developments, and had access to all necessary information, including depositions, medical records, and defense counsel reports. Great American also retained monitoring counsel to evaluate liability and exposure, further solidifying its hands-on role in the case. Additionally, it participated directly in shaping settlement strategy, coordinating with Everest and advising against certain settlement offers within the primary limit. This level of involvement provided Great American with every opportunity to safeguard its interests, underscoring that the timing of notice caused no prejudice whatsoever.

The undisputed facts establish that notice was timely and caused no prejudice to Great American. The Court should therefore find that the Great American Excess Policy provides coverage as a matter of law.

## ARGUMENT AND INCORPORATED MEMORANDUM OF LAW

### I. Count I of Great American's Amended Complaint

In Count I of its Amended Complaint, Great American seeks a declaration that it "has no coverage obligations for the Mendez Lawsuit." D.E. 60, ¶ 27. Great American alleges that "Oracle breached its contractual obligations to Great American in providing no notice to Great American until November 18, 2021[.]" *Id*. at ¶ 23. Great American alleges that it "was prejudiced by Oracle's late notice" based on the theory that "Great American was denied the opportunity to pressure Everest into settling the case within its limits[.]" *Id*. at ¶ 25. Great American also alleges that it was prejudiced "by having no opportunity to participate in [Oracle's] defense" prior to November 18, 2021. *Id.*

### II. Relevant Policy Language

The Great American Excess Policy contains the following notice provisions:

> **F.**  **Duties in The Event of An Occurrence, Claim or Suit**
>
> **1.** You must see to it that we are notified as soon as practicable of an "occurrence" which may result in a "claim" or "suit" under this policy. […]
>
> **2.** If a "claim" or "suit' against any "Insured" is reasonably likely to involve this policy you must notify us in writing as soon as practicable.

*See* D.E. 60-2, p. 28.

The Great American Excess Policy defines "claim" as "any demand for monetary damages upon an 'Insured' resulting from a covered 'occurrence.'" D.E. 60-2, p. 23. "Suit" is defined as "a

civil proceeding which seeks monetary damages because of 'bodily injury,' … to which this insurance applies." D.E. 60-2, p. 26. "Bodily injury" is defined as "physical injury, sickness, or disease, including death of a person. 'Bodily injury' also means mental injury, mental anguish, humiliation, or shock if directly resulting from physical injury, sickness, or disease to that person." D.E. 60-2, p. 23. For claims involving "bodily injury" (such as the Mendez Claim), the Excess Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." D.E. 60-2, p. 25.

### III. Choice of Law

Preliminarily, the Court must decide which state's law will apply to the Great American Excess Policy. Because this coverage issue is being litigated in a Federal District Court in Florida, Florida's choice of law rules determine which state's law will be applied in the event there is a conflict between Florida law and the law of another state whose law may be determined to govern the Great American Excess Policy. *See Fioretti v. Massachusetts General Life Ins. Co.*, 53 F. 3d 1228 (11th Cir. 1995).

In Florida, the rights and obligations of the parties under an insurance policy are governed by contract law. *Lumbermens Mut. Cas. Co. v. August*, 530 So.2d 293, 295 (Fla. 1988). In determining which state's law applies to contracts, Florida follows the rule of *lex loci contractus*, which provides that "the law of the jurisdiction where the contract was executed governs the rights and liabilities of the parties in determining an issue of insurance coverage." *State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So. 2d 1160, 1163 (Fla. 2006).

"In a case involving an insurance policy, the place where the contract was executed is generally considered to be the place where the policy is delivered." *State Farm Mut. Auto. Ins. Co. v. Baldassini*, 909 F.Supp.2d 1363, 1366 (S.D. Fla. 2012), *aff'd*, 545 Fed.Appx. 842 (11th Cir.

HICKS, PORTER, EBENFELD & STEIN, P.A.
5301 BLUE LAGOON DRIVE, SUITE 900, MIAMI, FL 33126 • TEL. 305/374-8171 • FAX 305/372-8038

2013); *accord Adolfo House Distributing Corp. v. Travelers Property & Cas. Ins. Co.*, 165 F.Supp.2d 1332 (S.D. Fla. 2001) (citing *Block v. Berkshire Ins. Co.*, 585 So.2d 1137 (Fla. 3d DCA 1991); *Pastor v. Union Central Life Ins. Co.*, 184 F.Supp.2d 1301 (S.D. Fla. 2002)); *Mid–Continent Cas. Co. v. Basdeo*, 742 F. Supp. 2d 1293, 1322 (S.D. Fla. 2010). Courts also consider whether the policy contains state-specific coverage forms. *See, e.g., Bedoya v. Travelers Prop. Cas. Co. of Am.*, 773 F.Supp.2d 1326 (M.D. Fla. 2011) (Florida law governed where the insured's business was located in Florida and coverage forms were drafted to comply with Florida law); *see also Wausau Underwriters Ins. Co. v. Baillie*, 281 F.Supp.2d 1307, 1313 (M.D. Fla. 2002).

Here, the Great American Excess Policy contains multiple pages which list an address for Oracle in Connecticut, which indicates that the policy was delivered to Oracle in Connecticut. *See* D.E. 60-2, pp. 2, 63, 71, 80, 83. Additionally, there is a Schedule of 43 forms and endorsements in the policy, all of which are Connecticut-specific. *Id.* at pp. 9-10. One of those endorsements is titled "Connecticut Changes" and specifically references "Connecticut law." *Id.* at pp. 59-61.

Everest does not take a position on which state's law applies to the Great American Excess Policy. For the purposes of this motion, Everest will assume that Connecticut law applies. As explained below, even if Florida law applies, the result is the same: notice was timely as a matter of law and Great American suffered no prejudice.

**IV.   Legal Standard for Late Notice Under Connecticut Law**

Under Connecticut law, there are two conditions that must be satisfied in order to justify denial of coverage based on failure to satisfy the "notice" provisions of a policy: "(1) an unexcused, unreasonable delay in notification by the insured, and (2) resulting material prejudice to the

insurer." *Arrowood Indem. Co. v. King*, 304 Conn. 179 (2012).[2] "[T]he insurer bears the burden of proving, by a preponderance of evidence, that it has been prejudiced by the insured's failure to comply with a notice provision. *Id.* at 201.

## V.   Notice to Great American Was Timely

The Great American Excess Policy contains two notice provisions.  First, Oracle was required to notify Great American "as soon as practicable of an 'occurrence' which may result in a 'claim' or 'suit' under this policy." D.E. 60-2, p. 18 (underlined emphasis added).  Second, Oracle was required to notify Great American "as soon as practicable" of a "'claim' or 'suit' against [Oracle] [that] is reasonably likely to involve this policy." *Id.* (underlined emphasis added). Under both provisions, there is an objective standard for determining whether notice was timely, and the standard was met for both provisions.

With respect to the second provision ("reasonably likely"), the testimony of Great American's corporate representative defeats any argument that notice was untimely.  By February 2022 (two months before trial), Great American had received all material information regarding the Mendez Lawsuit, yet it still believed the "reasonable case value" was in the "mid to high six-figure range," and it did not believe the case was "reasonably likely to exceed a million dollars at trial."  In fact, at all times prior to the verdict, Great American believed the verdict value for the Mendez Lawsuit would "not [be] over a million dollars based on the evidence." Accordingly, the undisputed facts clearly establish that notice was timely under the "reasonably likely" notice provision.

As for the first notice provision ("may result"), the Connecticut Supreme Court has held

---

[2] Florida law is consistent with Connecticut on the requirement of prejudice in order to deny coverage based on late notice. *See LoBello v. State Farm Fla. Ins. Co.*, 152 So. 3d 595 (Fla. 2d DCA 2014).

that the policy language "<u>as soon as practicable</u>" means "<u>as soon as can be reasonably expected under the circumstances</u>." *Arrowood Indem. Co. v. King*, 304 Conn. 179, 199 (2012). Regarding the "<u>may result</u>" language, courts have held that notice is required when there is a "<u>reasonable possibility</u>" that the claim could implicate the policy's coverage based on an <u>objective assessment</u> of the information available. *See, e.g., Christiania Gen. Ins. Corp. of New York v. Great Am. Ins. Co.*, 979 F.2d 268, 276 (2d Cir. 1992) (applying New York Law); *Am. Guarantee & Liab. Ins. Co. v. Simon Roofing & Sheet Metal Corp.*, 930 F. Supp. 2d 1331, 1337 (S.D. Fla. 2013) (applying Pennsylvania law), *aff'd,* 551 Fed. Appx. 527 (11th Cir. 2014).

Here, the Great American Excess Policy only provides coverage when there are damages in excess of Everest's $1 million primary policy limit. *See* D.E. 60-2, pp. 19, 84-85. Thus, there are two questions in determining whether notice was timely under the "may result" provision: (1) When, if ever, did the Mendez Lawsuit present an objectively reasonable possibility of damages against Oracle in excess of $1 million?; and (2) Was Great American notified of the Mendez Lawsuit as soon as could reasonably be expected once there was an objectively reasonable possibility of excess exposure?

Defense counsel's assessment of the insured's liability and damages are an important factor when determining whether a claim could implicate excess coverage. *See The Duty to Give Notice to Excess Insurers*, Timothy M. Thornton Jr., Brief, Winter 2012; *Evanston Ins. Co. v. Stonewall Surplus Lines Ins. Co.*, 111 F.3d 852, 860 (11th Cir. 1997) (applying Georgia and Wisconsin law) (concluding that notice to excess insurer was timely as a matter of law because the insured's defense attorney and the primary insurer's adjuster both valued the claim below the excess insurer's layer); *see also Atlanta Int'l Ins. Co. v. Checker Taxi Co.*, 574 N.E.2d 22 (Ill. App. 1991) (no violations of notice provision where there were defenses to liability that affected valuation of

claim).

The first evaluation of the Mendez Lawsuit came from Oracle's defense counsel on April 18, 2017, when John Andrews provided a report with his initial assessments. Mr. Andrews immediately expressed doubts about Oracle's liability, stating that "comparative negligence is a strong defense in our favor" because Mr. Mendez "should have looked before he stepped into the elevator." With respect to damages, Mr. Andrews noted that Mr. Mendez did not seek medical treatment for three days after the accident, and the initial medical records "do not show that he sustained a serious injury." Consistent with the scant evidence of damages, Mr. Andrews estimated a verdict range of **$20,000 to $50,000** *if* Oracle was found liable.

In April 2018, Oracle's new defense counsel, Peter Weinstein, received a surveillance report which confirmed that Mr. Mendez was able to work and perform as a DJ without any issues, casting further doubt on the severity and permanency of his injuries.

On January 28, 2019, Mr. Weinstein provided a report which continued to question the severity and permanency of Mr. Mendez's injuries. Mr. Weinstein further stated that "there is no basis" for Mr. Mendez's lost wages claim, and "the current medical specials do not exceed $15,000." Accordingly, Mr. Weinstein estimated that Oracle's exposure ranged from **$13,056 to $199,912.**

In 2020, Mr. Weinstein provided multiple written reports regarding depositions of several key witnesses, including Mr. Mendez. Based on their testimony, Mr. Weinstein continued to anticipate shared liability among Oracle, Cox Radio, and Mr. Mendez. Mendez's comparative fault was based on disregarding an email notification regarding the elevator maintenance and not exercising caution when entering the elevator. Cox Radio's liability was due to inadequate warnings and their non-delegable duty to maintain safe conditions as the building owner.

An October 2021 report from Mr. Weinstein was the first time that Oracle's defense counsel indicated a possibility of excess exposure. In fact, prior to that time, *everyone* who reviewed the Mendez Lawsuit concluded that its value did not exceed $200,000, which was supported by the relatively minor nature of Mr. Mendez's injuries and the lack of evidence of substantial damages. Moreover, there were good reasons to question the estimates in Mr. Weinstein's October 2021 report, as there was still no evidence detailing Mr. Mendez's lost wages claim, past medical expenses were only $50,000, and the necessity of future medical care was unclear. Additionally, Mr. Weinstein's low-end estimate for pain and suffering damages ($521,822) was more than double the high-end *total* damages in his most recent report ($199,912), and he provided minimal explanation as to why those numbers drastically increased.

Significant developments occurred in late October and November of 2021, including admissions of perjury from a key witness (Orlando Valle of Oracle), new evidence of potential income loss, and additional medical information suggesting possible surgeries. After these developments occurred, Great American was promptly notified on November 18, 2021.

Great American may argue that notice should have been provided upon receipt of Mr. Mendez's settlement demands which were in excess of the $1 million primary policy limit. However, demands from plaintiff's counsel are not determinative of whether, from an objective perspective, the claim was potentially going to implicate the Excess Policy, especially given the disparity between Mr. Mendez's demands and the evaluations of those associated with Oracle's defense. *See Evanston Ins. Co. v. Stonewall Surplus Lines Ins. Co.*, 111 F.3d 852, 861 (11th Cir. 1997) (holding that notice to excess insurer was timely as a matter of law, even though notice was given after the plaintiff made settlement demands exceeding the primary policy limits, because the demands were "not consistent" with the valuations provided by the insured's defense attorney and

the primary insurer's adjuster).

By January 2022 (three months before trial), Great American had received Mr. Mendez's medical records, it knew about Mr. Mendez's status as a local celebrity, it knew about the venue of the trial, it knew about the change in defense counsel, it knew about the adverse liability developments, it knew about the estimates in Mr. Weinstein's October 2021 report, it knew that no experts would be testifying at trial for the defense, and it knew about Mr. Mendez's settlement demands.  Despite all of that, Great American still viewed the Mendez Lawsuit as a "mid to high six-figure claim."  Great American maintained this assessment all the way through trial in April 2022.

It cannot be emphasized enough that Great American had all the information it needed to assess the Mendez Lawsuit prior to trial, yet it never valued the claim as implicating the excess layer.  It is nonsensical for Great American to suggest that notice should have been provided earlier when Great American itself believed the "reasonable case value" was in the "mid to high six-figure range" at all times prior to the verdict.

The undisputed facts clearly establish that notice to Great American was timely as a matter of law.  To the extent that there was an objectively reasonable possibility of excess exposure *at any point prior to the verdict*, notice to Great American in November 2021 was more than sufficient, as it coincided with the emergence of facts indicating a possibility of excess exposure.

**VI.    Great American Suffered No Prejudice**

Because notice to Great American was timely as a matter of law, judgment can and should be entered against Great American on that basis alone, and the Court need not reach the inquiry of whether Great American was "materially prejudiced" by the timing of notice.  Nonetheless, Great American will not be able to meet its burden of establishing "material prejudice," as the undisputed

material facts show that Great American suffered no prejudice whatsoever.

Under Connecticut law, "material prejudice" may exist when the insurer is deprived of the opportunity to participate in the insured's defense of the underlying claim. *Zahoruiko v. Fed. Ins. Co.*, 717 Fed. Appx. 50, 52 (2d Cir. 2018) (citing *Ellis v. Cnty. Agency, Inc.*, 2017 WL 3011674, at *3 (Conn. Super. Ct. May 25, 2017)). Additionally, "[t]he lack of opportunity to investigate a claim and being deprived the opportunity to pursue a settlement or compromise are examples of prejudice." *Ellis*, 2017 WL 1238457, at *2 (citing *Hartford Ins. Co. v. Colonia Ins. Co.*, 750 A.2d 1158, 1160 (Conn. App. Ct. 2000), *cert. denied*, 733 A.2d 851 (Conn. 1999)).

Here, Great American received notice of the Mendez Claim on November 18, 2021, which was six months before trial. Great American has admitted that Everest, the defense firms, and Oracle were all cooperative in providing the information Great American needed to evaluate the Mendez Lawsuit after it received notice. Great American regularly corresponded with Everest and Oracle's defense counsel to stay abreast of case developments and give input on defense strategy.

Great American had ample opportunity to investigate the claim thoroughly, and it received all necessary information upon being notified. Great American was able to access depositions, medical records, and reports from defense counsel, yet Great American did not identify any missing information or express concerns about the investigation's thoroughness or defense counsel's valuations. Moreover, Great American was able to hire their own monitoring counsel to assist with evaluating Oracle's liability and exposure.

Unquestionably, Great American had every opportunity to (and did, in fact) actively participate in Oracle's defense. Indeed, Great American admitted that it had an adequate opportunity to participate in decision-making for six months leading up to trial. Great American was actively involved in coordinating with Everest to ensure that the defense was adequately

managed. Armed with all information and personnel necessary to assess the Mendez Claim, Great American approved the stipulation of liability and the retention of new trial counsel for Oracle, further demonstrating that Great American was not hindered by the timing of notice.

There is some Connecticut case law which suggests that an insurer is not required to prove that its earlier involvement would have led to a more favorable outcome in order to establish prejudice. *See Greater New York Mut. Ins. Co. v. Robbins Eye Ctr. P.C.*, 2022 WL 867761, at *13 (D. Conn. Mar. 23, 2022) (collecting cases). However, none of those cases involve late notice claims by an excess insurer, which is a critical distinction. "[E]xcess carriers are not interested in receiving notice of every claim against their insureds. The excess insurer does not undertake to defend the insured. Consequently, the excess insurer is not interested in every accident, but only in those serious enough to involve it." *Evanston Ins. Co. v. Stonewall Surplus Lines Ins. Co.*, 111 F.3d 852, 860–61 (11th Cir. 1997); *see also Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Gen. Star Indem. Co.*, 216 Fed. Appx. 273, 280 (3d Cir. 2007) ("[T]he requirement of prejudice is even more compelling in the excess insurance context. Unlike primary insurers, excess insurers have no right to control a lawsuit and thus have less need for early notice."); *Employers' Liab. Assur. Corp., Ltd. v. Hoechst Celanese Corp.*, 684 N.E.2d 600, 609 (Mass. App. Ct. 1997) ("Excess carriers are not as likely as primary carriers to suffer harm from late notice because they are [removed] from the investigation and handling of claims: ordinarily they are not bound to do this work and they have no duty to defend the insured.").

The majority rule is that an insurer must prove that earlier notice and its participation in the defense would have led to better outcome in order to establish prejudice. *See, e.g., Trustees of the University of Pa. v. Lexington Ins. Co.*, 815 F.2d 890 (3rd Cir. 1987) (applying Pennsylvania law) (alleged interference with excess insurer's right to associate in the defense "is too amorphous

and cannot itself constitute prejudice unless [the excess insurer] can demonstrate that earlier notice would probably have led to a more advantageous result"); *see also Old Republic Ins. Co. v. Underwriters Safety & Claims, Inc.*, 306 Fed. App'x 250 (6th Cir. 2009) (applying Kentucky law) ("[A] showing of prejudice requires the insurer to point to some reasonable possibility that the outcome would have been different if it had received notice [earlier]."); *State Farm Mut. Auto. Ins. Co. v. Stanley*, 966 F.2d 628 (11th Cir. 1992) (to establish prejudice under Georgia law, an excess insurer must present "evidence as to what the insurer would have done differently to prevent the prejudice which it alleges to have suffered"); *Ins. Co. of State of Pennsylvania v. Associated Intern. Ins. Co.*, 922 F.2d 516 (9th Cir. 1990) (applying California law); *Aseff v. Catlin Specialty Ins. Co., Inc.*, 115 F. Supp. 3d 1364 (S.D. Fla. 2015) (insurers are not prejudiced by late notice if earlier notice would not have led to a different outcome) (citing *Niesz v. Albright*, 217 So. 2d 606, 608 (Fla. 4th DCA 1969)); *Fund for Animals, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 130 A.3d 1155, 1170 (Md. Ct. Spec. App. 2016) (finding no prejudice as a matter of law where insurer had no right to control the insured's defense and could have done nothing during the delay in notice to change the outcome of the underlying case), *aff'd*, 153 A.3d 123 (Md. 2017); *Employers' Liab. Assur. Corp., Ltd. v. Hoechst Celanese Corp.*, 684 N.E.2d 600, 608 (Mass. App. Ct. 1997) (insurer must prove that it was relegated to a "substantially less favorable position than it would have been in had timely notice been provided").

Great American may argue that it would have taken a more proactive role in managing Oracle's defense, such as retaining medical experts, if notice was provided earlier. This position is clearly fabricated. It is not reflected in any of Great American's claim notes, it is not cited in Great American's reservation of rights letter or its coverage denial letter, and it is not reflected in Great American's interrogatory responses. Moreover, Great American knew there were no expert

witnesses testifying for the defense in April 2022 when it confirmed that it was comfortable taking the case to verdict.

In any event, self-serving testimony regarding what Great American "would have done" with respect to expert retention is inadmissible and should not be considered. *See* D.E. 160, p. 5. Even if the Court accepts Great American's speculative, unpled theory of expert retention as a basis for prejudice, there is no evidence that such expert retention would have led to a more favorable result. *See Trustees of Univ. of Pennsylvania v. Lexington Ins. Co.,* 815 F.2d 890 (3d Cir. 1987) (applying Pennsylvania law) (excess insurer was not prejudiced by late notice, despite its claim of being deprived of the opportunity to retain an expert on the underlying claimant's reduced life expectancy, where the evidence did not demonstrate that such expert testimony would have led to a more advantageous result).

Great American also alleges it was prejudiced by not being able to pressure Everest into settling within the $1 million primary limit.  This theory of prejudice is invalid as a matter of law. There is no Connecticut or Florida case law which stands for the proposition that prejudice can be established based on an excess insurer's inability to pressure the primary carrier to settle within limits.  In any event, Great American was fully involved in settlement negotiations from November 2021 through trial in April 2022, even directing certain decisions on offers within Everest's primary limit. Great American did not pressure Everest to offer the full primary policy limit at any point (despite having six months' worth of opportunities to do so), and it did not document any need for a higher offer.  In fact, Great American repeatedly stated that offering the $1 million limit would not be a good negotiation strategy and recommended against increasing offers within and up to the $1 million limit.  *See Valley Bancorporation v. Auto Owners Ins. Co.*, 569 N.W.2d 345 (Wis. Ct. App. 1997) (excess insurer was not prejudiced by notice provided five months before

trial where the insurer did not attempt to clarify coverage issues prior to trial and refused to participate in post-trial settlement negotiations), *review denied*, 576 N.W.2d 281 (Wis. 1997).

By actively directing the defense and settlement efforts, Great American gave Everest and Oracle no reason to believe it would deny coverage. Everest and Oracle honored Great American's directives with a reasonable and warranted expectation that Great American would be ready to pay up to its policy limits to indemnify Oracle if an excess judgment was rendered. However, when it came time for Great American to pay up, it contrived a self-serving basis to deny coverage nearly a year after it was provided notice and five months after the trial that it actively monitored and participated in. This belated coverage denial illustrates a pattern of after-the-fact, manufactured excuses for Great American.

There is no merit whatsoever to Great American's claim of late notice. The undisputed facts clearly establish that notice was timely, and Great American suffered no prejudice. Accordingly, the Court should find that the Great American Excess Policy provides coverage as a matter of law.

## **CONCLUSION**

WHEREFORE, Everest respectfully requests that this Honorable Court enter judgment against Great American on Count I of its Amended Complaint.

## **Request for Hearing**

Pursuant to Local Rule 7.1(b)(2), Everest respectfully requests an oral argument on this Motion for Summary Judgment. A hearing would assist the Court by allowing Everest to thoroughly explain the factual and legal reasons supporting the motion and to respond to any questions the Court may have. A hearing would facilitate a more thorough examination of the issues raised, providing valuable context for the Court's decision-making. Everest estimates that

approximately 2 hours would be sufficient for the hearing.

                                Respectfully submitted,

By:   /s/ Jackson Shuford
       JACKSON F. SHUFORD
       Florida Bar No. 1018807
       IRENE PORTER
       Florida Bar No. 567280
       HICKS, PORTER, EBENFELD & STEIN, P.A.
       5301 Blue Lagoon Drive, Suite 900
       Miami, FL  33131
       Tel:    305/374-8171
       Fax:   305/372-8038
       Primary:      iporter@mhickslaw.com
                           jshuford@mhickslaw.com
       Secondary:   eclerk@mhickslaw.com
                           bpaz@mhickslaw.com
                           gmunoz@mhickslaw.com
*Counsel for Everest National Insurance Company*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on **November 13, 2024**, a true and correct copy of the foregoing was filed using the Court's Electronic Filing system (CM/ECF), which will serve a copy on all counsel of record.

By: /s/ Jackson Shuford
JACKSON F. SHUFORD
Florida Bar No. 1018807